**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A1547. CITY OF SANDY SPRINGS et al. v. MILLS.

PHIPPS, Chief Judge.

The City of Sandy Springs and 28 alleged "direct descendants" of the grantor of a deed and of one of several individuals named in the deed in whose favor a one acre tract of land had been conveyed in 1900 for the purposes of a family burial ground, appeal the trial court's denial of their joint motion for summary judgment on a complaint for declaratory judgment Christopher Mills filed in August 2012.[1] Mills, who was conveyed the property after it had been sold in a tax sale, filed the complaint after the City denied his request for a permit to build a single-family residence on the portion of the acre tract which contained no graves. The appellants also contend that

---

[1] This court granted the appellants' application for interlocutory appeal.

the trial court committed reversible error by failing to address their contentions as to the validity of the tax sale by the county. For the reasons that follow, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[2] To prevail on a motion for summary judgment, the moving party must show that there is no genuine dispute as to a specific material fact and that this specific fact is enough, regardless of any other facts in the case, to entitle the moving party to judgment as a matter of law. When a defendant moves for summary judgment as to an element of the case for which the plaintiff, and not the defendant, will bear the burden of proof at trial, the defendant may show that he is entitled to summary judgment either by affirmatively disproving that element of the case or by pointing to an absence of evidence in the record by which the plaintiff might carry the burden to prove that element. And if the defendant does so, the plaintiff cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue. We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant.[3]

On February 20, 1900, John S. Heard executed a deed in favor of about eight named individuals to a one acre tract of land, for the purposes of a family burial

---

[2] OCGA § 9-11-56 (c).

[3] *Maree v. ROMAR Joint Venture*, 329 Ga. App. 282, 283 (763 SE2d 899) (2014) (citations omitted).

2

ground and to be used for said purposes only. One of the individuals in whose favor the deed was executed was Carl Heard. A tax deed shows that on December 5, 2006, the acre tract was sold at a sheriff's sale for delinquent property taxes, the grantors being "Carl C. Heard, Jr. and Mary H. Ellis, ("Owners") by and through . . . the Sheriff." The tax deed was filed and recorded on January 10, 2007.

On December 21, 2007, "MARY H. ELLIS A.K.A. MARY ANN ELLIS ELSNER" executed an "Affidavit of Descent," stating that her sibling Carl C. Heard, Jr., had died intestate on June 15, 1992, had never married and had no children, and all of the debts of his estate had been fully paid. That same day, "MARY H. ELLIS A.K.A. MARY ANN ELLIS ELSNER, individually and as Sole Surviving Heir of CARL C. HEARD JR." executed in favor of Henry Cline an "Assignment of Rights for Tax Parcel" regarding the acre tract. Further, "MARY H. ELLIS A.K.A. MARY ANN ELLIS ELSNER . . . INDIVIDUALLY AND AS THE SOLE SURVIVING HEIR OF CARL C. HEARD, JR. DECEASED" executed a quitclaim deed, conveying the acre tract to Cline "for and in consideration of the sum of TEN AND 00/100 ($10.00) Dollars and other good and valuable consideration." Appellants assert that Mary H. Ellis executed the quitclaim deed for the acre tract in favor of Cline in exchange for $10,000; Mills does not dispute this assertion. The three

3

documents - affidavit of descent, assignment of rights, and quitclaim deed - were all filed and recorded on December 27, 2007.

Cline paid the redemption price to the entity that had purchased the property in the tax sale, and that entity (on December 27, 2007 ) "in turn issued a quitclaim deed in favor of Carl C. Heard, Jr. and Mary H. Ellis, who had already quitclaimed their purported interest in the Property to Mr. Cline." On July 31, 2012, Cline conveyed the property by quitclaim deed to his daughter and her husband, Christopher Mills, "for and in consideration of the sum of ONE AND NO/100 U.S. Dollars ($1.00)."

In December 2011, Mills and his wife initiated communication with the City about building a single-family residence on the "raw land" portion of the property or, in other words, that portion of the acre tract upon which there were no graves. It is undisputed that twenty or more human graves were situated on the property, "neatly arranged in clusters and rows," that the graves covered approximately 0.20 acres of the northwestern portion of the acre tract, and that the most recent human burial identifiable on the tract had occurred in 1971. The City declined to issue Mills a residential single-family building permit, on the basis that the acre lot was encumbered by a "cemetery use restriction," and would not be permitted for any other

use. In August 2012, Mills filed a complaint for declaratory judgment, naming the City as the defendant, and asserting that, for various reasons, the restriction on the use of the entire acre tract as a family burial ground was no longer enforceable or, alternatively, that the City had "effectuated a taking of the Property by enforcing an unenforceable restriction covenant, . . . entitling Mills to just compensation."

The City filed an answer, denying therein the "existence of a cause of action for which [Mills] would have redress before Court to seek a declaratory judgment." On November 9, 2012, 28 purported descendants of John S. Heard and of one of the individuals (not Carl Heard) named in the 1900 deed filed a motion to intervene as defendants in the case; they also filed an answer and counterclaim to Mills's complaint. Mills consented to the motion to intervene. In their answer and counterclaim, the purported descendants asked the trial court to, among other things: (1) issue a declaratory judgment, "finding that the Cemetery is a family burial ground that has not been abandoned and, as such, [Mills] is prohibited from disturbing it in any fashion"; and (2) issue a declaratory judgment, "finding that legal ownership of the Cemetery is vested in the descendants of the individuals named in the original 1900 Deed from [John S.] Heard to his heirs."

5

On February 27, 2013, the City and the purported descendants filed a document entitled "Defendants' Notice of Joint Motion for Summary Judgment and Declaratory Relief," asking the trial court to grant summary judgment in their favor regarding Mills's complaint "on the ground that the Heard Family Cemetery has been perpetually dedicated as a private burial ground and, therefore, [Mills] cannot appropriate it for any other purpose, including constructing a single family residence." The City and the purported descendants "[a]dditionally" sought a "declaratory judgment that legal title to Heard Family Cemetery rests in the hands of . . . John Heard's heirs as descended through the individuals named in the February 20, 1900 deed, which perpetually established Heard Family Cemetery as a private burial ground"; the appellees challenged the validity of the tax sale and deed.

The trial court denied the motion for summary judgment, concluding that while "alleged descendants of a prior owner of the Property" had an "easement in the Cemetery Limits," "[t]here exist material issues of fact as to what portion of the Property has been or might be used for burial purposes. Similarly, the record reflects that the undeveloped portion of the Property contains mature tree growth and at some point in time may have been physically separated from the cemetery proper by a fence." The court did not address the appellants' motion for declaratory judgment

6

with regard to the validity of the tax sale and deed, and who held legal title in the cemetery.

1. The City and the purported descendants contend that the trial court erred by holding that material issues of fact exist regarding whether "portions of the Heard Cemetery have been abandoned."[4]

> When a family burial plot is established, it creates an easement against the fee, and while the naked legal title will pass, it passes subject to the easement created. . . . The easement and rights created thereunder survive until the plot is abandoned either by the person establishing the plot or his heirs, or by removal of the bodies by the person granted statutory authority.[5]

> "Abandoned cemetery" means a cemetery which shows signs of neglect including, without limitation, the unchecked growth of vegetation, repeated and unchecked acts of vandalism, or the disintegration of grave markers or boundaries and for which no person can be found who is

---

[4] It is apparent by the appellants' appeal brief that by "Cemetery," they mean the entire acre tract of land which was deeded for the specified purpose of serving as a burial ground.

[5] *Walker v. Ga. Power Co.*, 177 Ga. App. 493, 495 (1) (339 SE2d 728) (1986) (citations, punctuation, and emphasis omitted).

7

legally responsible and financially capable of the upkeep of such cemetery.[6]

Although *Arlington Cemetery Corp. v. Bindig*[7] involved the dedication of land for a public cemetery,[8] and what is involved in this case is the dedication or intended restriction on the use of private property for family burial purposes, as regards the issue of abandonment, the Supreme Court of Georgia in *Arlington* stated that "[a]bandonment is largely a question of intent. This intent is inferable from the acts of the parties, interpreted in the light of all the surroundings . . . Abandonment is a mixed question of law and fact."[9]

In moving for summary judgment (and on appeal) the appellants posited, "there is no set of facts under which [Mills] could prove that [John S. Heard's] descendants have abandoned their interests in the Cemetery." Appellants pointed to evidence showing that the grave sites, collectively, are recognized by the Sandy Springs community as the Heard Family Cemetery, or burial ground; there are multiple

---

[6] OCGA § 36-72-2 (1).

[7] 212 Ga. 698 (95 SE2d 378) (1956).

[8] Id. at 703-704 (2).

[9] Id. at 704 (2) (citations and punctuation omitted).

8

headstones that can be easily seen from Heards Drive; various neighborhood groups and individual neighbors have cleaned up the cemetery and paid for tree removal services over the years; and 28 descendants of John S. Heard have intervened in "this action to protect their interests in the Cemetery."

Mills responded by pointing to evidence (or the absence thereof) in the record showing that in May 2012, an archeologist determined that no human burial had taken place in the cemetery since 1971; none of the alleged descendants stated that they had maintained the cemetery or did anything to expand the cemetery into the undeveloped 0.80 acre portion of the acre tract; and none of the descendants had paid the ad valorem taxes that had been assessed on the property, redeemed the property after the tax sale, or "even challenged the [tax] levy." None of the descendants had averred in their affidavits that they were legally responsible and financially capable of the upkeep of such cemetery. The trial court found (and the evidence showed), inter alia, that Cline maintained the property after he purchased it in the tax sale, the undeveloped portion of the acre tract contained mature trees, and there were "remnants" of a fence that appeared to have enclosed the cemetery.

There was evidence that the descendants had abandoned the acre tract of land that had been conveyed for the purposes of a family burial ground, and Mills met his

9

burden on summary judgment by pointing to specific evidence giving rise to a triable issue of fact.[10] Accordingly, the trial court did not err by denying the appellants' motion for summary judgment as to Mills's complaint for declaratory judgment.

2. The appellants also contend that the trial court committed reversible error by "failing to address their contentions that the sale of the cemetery to Mills is void because cemeteries in Georgia are exempt from ad valorem taxes."

In their answer and counterclaim, the purported descendants alleged that their right to the acre tract was "threatened by a series of land transfers that are void," and they asked the trial court to "issue a Declaratory Judgment finding that legal ownership of the Cemetery is vested in the descendants of the individuals named in the original 1900 Deed from [John S.] Heard to his heirs." In their motion for summary judgment and declaratory judgment, the City asserted, and the purported descendants continued to assert, that the trial court "should declare that legal title to the cemetery rests in the possession of the heirs of the individuals named in the

---

[10] See OCGA §§ 36-72-2 (1); 9-4-6 (providing for the submission of fact issues to the jury in declaratory judgment actions). See generally *Walker*, supra at 497-498 (1) (heir abandoned her rights in a private cemetery when she acquiesced in the removal and reinterment of the remains of her ancestors in relocated cemetery; therefore, trial court erred in not granting condemnor's motion for summary judgment regarding heir's claim of inadequate compensation for relocation of cemetery).

original deed," and in support thereof they argued that "the tax deed executed by Fulton County . . . should be declared void because the deed did not convey the cemetery and, even if it did, cemeteries are exempt from property taxes in the State of Georgia."

"It is the duty of a litigant to obtain a ruling on his motions or objections."[11] There is no indication in the appellate record that the appellants made any effort to elicit a ruling from the trial court with regard to their motion for declaratory judgment concerning the validity of the tax sale and deed, and who held legal title in the property. The record shows that seven days after the trial court entered the order from which the appellants appeal, the appellants filed in the trial court a request for a certificate of immediate review. In their request, the appellants made no mention of their motion for declaratory judgment, referring solely to their "Joint Motion for Summary Judgment" and the trial court's ruling thereon with regard to the issue of

---

[11] *Shropshire v. Alostar Bank of Commerce*, 314 Ga. App. 310, 313 (2) (a) (724 SE2d 33) (2012) (punctuation and footnote omitted); see *Tipton v. State of Ga.*, 321 Ga. App. 870, 872 (1) (743 SE2d 532) (2013); *American Mgmt. Svcs. East v. Fort Benning Family Communities*, 318 Ga. App. 827, 831, n. 3 (734 SE2d 833) (2012); *Ware v. Fidelity Acceptance Corp.*, 225 Ga. App. 41, 42 (1) (482 SE2d 536) (1997). Compare *Walker*, supra at 497 (1) ("The superior court . . . erred in refusing to consider . . . questions, which were properly raised . . . in [a] motion for summary judgment.").

11

whether the acre tract of land, or any part thereof, had been abandoned. The appellants' failure to obtain a ruling on their joint motion for a declaratory judgment (concerning the validity of the tax sale and deed, and legal ownership or title of the acre tract) resulted in a waiver of review of that issue in this appeal.[12]

*Judgment affirmed. Ellington, P. J., concurs. McMillian, J., concurs specially.*

---

[12] *Shropshire*, supra; *American Mgmt. Svcs. East*, supra; *Peace v. Dominy Holdings*, 251 Ga. App. 654, 657 (2) (554 SE2d 314) (2001).

A14A1547. CITY OF SANDY SPRINGS et al. v. MILLS.

MCMILLIAN, Judge, concurring specially.

Although I agree with the majority that the trial court properly denied appellants' joint motion for summary judgment, I do not agree with all that is said in the majority opinion and write separately to set out the complete statutory framework applicable to the issues raised in this appeal.[1]

---

[1] Accordingly, this case lacks precedential value. See Court of Appeals Rule 33 (a).

As more fully set out in the majority opinion, Christopher Mills filed a complaint for declaratory judgment after the City of Sandy Springs ("City") declined to issue him a permit to allow him to build a single-family home on a portion of a one-acre parcel of land that formerly had been deeded for the purpose of a family burial ground. This action is governed by a statutory scheme enacted in 1991, in which the legislature expanded the provisions governing the use and development of burial grounds and cemeteries, including providing for criminal penalties for violations. See OCGA §§ 36-72-1 to 36-72-16; Ga. L. 1991, p. 924, § 3 (hereinafter the "Act").[2] In so doing, the legislature declared "that human remains and burial objects are not property to be owned by the person or entity which owns the land or water where the human remains and burial objects are interred or discovered, but human remains and burial objects are a part of the finite, irreplaceable, and nonrenewable cultural heritage of the people of Georgia which should be protected." OCGA § 36-72-1 (a).

---

[2] Prior to 1991, more limited provisions were in place relating to disturbing burial grounds for land development. See Ga. L. 1991, p. 924, §§ 1 and 2.

2

With respect to this case, OCGA § 36-72-4 requires an owner of property that contains a burial ground to obtain a permit before developing the property or any portion thereof as follows:

> No known cemetery, burial ground, human remains or burial object shall be knowingly disturbed by the owner or occupier of the land on which the cemetery or burial ground is located for the purposes of developing *or changing the use of any part of such land* unless a permit is first obtained from the governing authority of the municipal corporation or county wherein the cemetery or burial ground is located[.]

(Emphasis added.) Id. Thus, an initial question is whether the one-acre parcel is a "burial ground" for which a permit is required. Mills contends that the portion of the property where he intends to build a home is not, whereas the City asserts that the entire parcel is a burial ground.

The term "burial ground" is defined in the Act as "an area dedicated to and used for interment of human remains. The term shall include privately owned burial plots, individually and collectively, once human remains have been buried therein. The fact that the area was used for burial purposes shall be evidence that it was set aside for burial purposes."[3] OCGA § 36-72-2 (3). Accordingly, two things are

---

[3] Similarly, OCGA § 36-72-2 (5) defines a cemetery as "any land or structure in this state dedicated to and used for interment of human remains. It may be either

3

required for an area of land to be considered a burial ground – that the area has been dedicated for the interment of human remains and that the area has been used for the interment of human remains.

The facts of this case show without dispute that the approximately one-acre tract at issue was dedicated, by deed, for use as a family burial ground. With respect to the use of the property, it is undisputed that a not insignificant number of interments have occurred on part of the acre parcel, grave markers have been put in place, and members of the local community consider the property to be the Heard family's burial ground. Thus, the record shows without dispute that the acre parcel was both dedicated and used for the purpose of interment of human remains. Further, there is no evidence, so far as the record shows, that the land had been used for anything other than its dedicated purpose. Accordingly, the acre parcel was clearly a "burial ground" as that term is defined in the statute.[4]

---

a burial park for earth interments or a mausoleum for vault or crypt interments or a combination of one or more thereof."

[4] I would reject Mills' assertion that only the land where human remains have been interred has been "used" for purposes of defining the burial ground. Under the plain language of OCGA § 36-72-2 (3) a burial ground is to "include" privately owned burial plots, suggesting that the term "burial ground" also includes other portions of the property used for its dedicated purpose.

It is only after a determination that the land in question is a burial ground that the issue of abandonment is reached. And I agree with the majority that the issue of abandonment must be decided by a jury taking into account the non-exhaustive list of factors contained in OCGA § 36-72-2 (1). However, I would further note that even if a jury finds that the burial ground has been abandoned, it does not follow that Mills' ability to build on the property is unfettered. First, the permitting statute appears to apply to the development of all burial grounds and cemeteries, whether abandoned or not. See OCGA § 36-72-4. And pursuant to OCGA § 36-72-3, the City has within its discretion to preserve and protect any abandoned burial ground or cemetery and to exercise its power of eminent domain to acquire any interest in land necessary for that purpose. See OCGA § 36-72-3; *Smith v. Pulaski County*, 269 Ga. 688 (501 SE2d 213) (1998) (county has discretion to protect or preserve abandoned cemetery or burial ground).

Additionally, because the trial court and the majority rely on the presence of remnants of a "dividing" fence in their analysis, I would also point out that it is by no means clear to me from my de novo review of the record that a fence in fact divided the parcel into a burial and a non-burial area. The copy of the survey contained in the record is somewhat difficult to read, but the only notations denoting "fence posts"

5

appear to be near the northern corner of the cemetery and along the southern boundary of the acre lot. However, the archeologist does state in his affidavit that he inspected the ground "beyond the fence and into the undeveloped portion of the property[,]" and the trial court and the parties appear to accept a fence in this location, so it may very well be that the markings are just not discernible on the copy of the survey contained in the record. But we need not belabor the lack of clarity here, which will obviously be fleshed out by the parties when this case is presented to the jury.

2. As to Division 2, I write only to make plain that the trial court's order does not clearly foreclose consideration of these issues, the outcome of which may, in any event, be somewhat dependent on the determinations made by the jury on the other issues at trial. Accordingly, I do not believe that the failure to secure a ruling on these issues forecloses their review at some later juncture.